FILED

2012 Mar-30  AM 10:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **RABIN PANT and PRAVIN PANT,)** | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **2:10-cv-00461-AKK** |
| ) | |
| **THE BOARD OF TRUSTEES OF** ) | |
| **THE UNIVERSITY OF** ) | |
| **ALABAMA, an educational** ) | |
| **institution, and MELISA KELLY,** ) | |
| **an individual,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Rabin Pant ("Rabin") and Pravin Pant ("Pravin") (collectively "Plaintiffs")

allege claims for discrimination against the Board of Trustees of the University of

Alabama ("UAB") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e *et seq.*, and claims under 42 U.S.C. §§ 1981 and 1983 against Melisa Kelly

("Kelly").  Doc. 11.[1]  Presently before the court is a motion for summary judgment

by UAB and Kelly (collectively "Defendants").  Doc. 26.

After considering the pleadings, evidentiary submissions, and the relevant

---

[1]Plaintiffs filed their complaint on March 5, 2010, doc. 1, and amended it on April 23, 2010, doc. 11.

law, the court **DENIES** UAB's motion, but **GRANTS** Kelly's motion since she is

entitled to qualified immunity.  The court sets this matter for a Pretrial Conference

on **May 18, 2012, at 10:30 a.m.** and a trial on **July 9, 2012, at 9:00 a.m.** at the

Hugo Black United States Courthouse in Birmingham, Alabama.

## I.  SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rules of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden

of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving

party bears the initial burden of proving the absence of a genuine issue of material

fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to

"go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id.*

at 324. (internal citations and quotations omitted).  A dispute about a material fact

is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## II.  FACTUAL BACKGROUND[2]

### A.  Plaintiffs' employment at UAB

UAB hired Plaintiffs, brothers of Indian descent born in Nepal, as Lead Systems Analysts in its Health System Information Services ("HSIS") clinical division in July 2004.  Doc. 27 at 3 ¶¶ 1 and 2; Doc. 30 at 3.  At some point, Plaintiffs became partners in their father's consulting company, Pant Healthcare Group.  Doc. 30 at 7-8.  They worked concurrently for UAB and Pant Healthcare during the relevant time period in this case. Doc. 27 at 5 ¶ 11; doc. 30 at 4 ¶ 11. UAB discharged Plaintiffs on February 12, 2008, for using UAB time and resources for Pant Healthcare work.  According to HSIS Chief Information Officer Joan Hicks ("Hicks"), UAB discharged Plaintiffs for "multi-faceted" reasons centered on "the type of business that they were running," as well as "the fact that they were running the business on . . . [UAB] assets."  Doc. 26-1 at 73-74, Hicks Depo. at 16-17.  At the time of their discharge, Rabin reported directly to Larry McDanal ("McDanal"), and Pravin reported to Bryan Webb ("Webb").  Doc. 26-1 at 33, Kelly Depo. at 21-24.  Both Webb and McDanal reported to Melanie Turner

---

[2] The facts are presented in a light most favorable to Plaintiffs.  *Adickes*, 398 U.S. at 157.

("Turner"), manager of the HSIS clinical division, who in turn reported to Kelly, HSIS Director.  Doc. 30 at 7 ¶ 4; doc. 26-1 at 33, Kelly Depo. at 21-22.

    **B.**    **UAB's External Consulting Policy**

    The "You and UAB" employee handbook, which Plaintiffs received and agreed to follow, contains a policy on "External Employment and External Consulting." Doc. 26-1 at 15; doc. 26 at 16, Rabin Depo. at 38; doc. 33-1.  Under the policy, employees can engage in consulting work if (1) it does not interfere with their UAB job function and performance, (2) is compatible with UAB's interests and poses no conflict of interest, (3) "does not require significant use of UAB resources or facilities," and (4) they have discussed and obtained "the prior written approval of . . . [their] manager." Doc. 33-1.  Moreover, although UAB discourages employees from engaging in consulting work during work hours, UAB allows it if the employees charge their time as vacation or personal days or non-paid time.  *Id.*  In other words, UAB allows employees to work as consultants for other entities while physically on-site at UAB, as long as the employee does not double dip by charging UAB also for the time he or she is spending on their outside work.

    Furthermore, the policy allows employees to use UAB resources for their consulting work, provided that they refrain from the "significant use of UAB

4

resources or facilities." Doc. 33-1.  The policy does not define "significant use" and, instead, leaves the determination to UAB managers.  According to Kelly, abuse is "excessive" use of resources, including storage of "any non-UAB material on a UAB PC," such as a personal photograph, or making "more than one or two personal phone calls a week," or the storage of any personal information on UAB's server due to virus risks and threats to the production environment, or storage of files using more than five percent of a computer's storage capacity. Doc. 26-1 at 44, 45, Kelly Depo., at 64-66, 71-72, 84.  However, "casual occasional use of a computer" for personal internet browsing is okay.  Doc. 26-1 at 46, Kelly Depo. at 74-75.  Excessive use can lead to discharge if it is disruptive or interferes with job performance.  Doc. 26-1 at 44, 46, Kelly Depo. at 68, 76. However, verbal counseling is typically the first step in UAB's disciplinary process.  *See* doc. 26-1 at 47, Kelly Depo. at 77.

UAB reviews the External Employment and External Consulting and conflicts of interest and commitment policies with employees through its annual Corporate Compliance training program.  Doc. 26-1 at 40, Kelly Depo. at 50; *see* doc. 26-1 at 60-61.  The training instructs employees to disclose in writing to their supervisor any potential conflicts from their external work and that failure to comply "may be grounds for disciplinary action, up to and including termination."

Doc. 26-1 at 61.  However, UAB does not "immediately terminate [employees] for engaging in outside work" without first obtaining pre-approval from a supervisor; rather, it "would depend on the circumstances," but "would warrant some type of progressive discipline, probably minimally a heavy verbal warning . . . [or] we may do something like a suspension if it was the first time." Doc. 26-1 at 76, Hicks Depo. at 27and 28.

### C.    Plaintiffs' outside consulting

On February 6, 2008, Andy Flynn ("Flynn") at HPG Consulting ("HPG") e-mailed Kelly and Hicks to report that while HPG was at UAB, Plaintiffs requested assistance from HPG on a surgery scheduling code that Plaintiffs developed through Pant Healthcare for St. John's Medical Center ("St. John's").  Doc. 27 at 5; doc. 26-1 at 42, Kelly Depo., at 59; doc. 26 at 31.  Allegedly, Plaintiffs wanted HPG to do work for Plaintiffs' client, St. John's, and for HPG to bill UAB for this work.[3]  Specifically, Kelly testified that Flynn reported that Plaintiffs "requested [HPG consultants'] help in getting the report [for St. John's] to run successfully. Those requests were made via email.  So we have those emails where Rabin and Pravin made the request" and the subsequent exchange.  Doc. 26-1 at 42, Kelly Depo. at 59; *see also* Doc. 26-1 at 73, Hicks Depo. at 15 (Hicks' testified that

---

[3] HPG performed consulting work for both UAB and St. John's.  Doc. 26 at 17, Rabin Depo. at 42; doc. 26 at 31, Rabin Depo. Ex. 1.

Plaintiffs "enlisted the support and use of a third-party vendor [HPG] that we had on-site doing work for us in other contexts to help troubleshoot the report they had written for. . . St. John's.").

Plaintiffs deny engaging HPG to assist on their St. John's project.  Doc. 30 at 4 ¶ 13.  The e-mails Kelly reference indicate that when Plaintiffs' contact at St. John's, Kim Ballard ("Ballard"), took maternity leave, St. John's replaced Ballard with Tracey Spear ("Spear"), a senior consultant at HPG.  Doc. 36 at 12. According to Spear, St. John's asked him "to review a scheduling report that Pant Healthcare . . . was developing for St. John's" and that, subsequently, Spear asked two other HPG consultants, Joe Vanderbeek ("Vanderbeek") and Gary Pollard ("Pollard"), for assistance on the report.  Doc. 36 at ¶¶ 3-10; Doc. 26 at 31.  In other words, contrary to Flynn's report to UAB, the request for help came from HPG employee Spear pursuant to a separate business relationship between HPG and St. John's.

None of the e-mail exchanges regarding the scheduling code included Vanderbeek or Pollard.  Rather, they contained exchanges between Plaintiffs, Spear, Ballard, Greg Davis from St. John's, and David Kushan, another contractor. Doc. 36 at 4-24; doc. 26 at 18, Rabin Depo. at 47-48.  Despite this fact, Flynn's e-mail to Kelly and Hicks stated that, based on the e-mail communications between

Spear and Plaintiffs, it was "apparent to [Flynn] that [Vanderbeek] and [Pollard] were working under the impression that this was a UAB report."  Doc. 26 at 31. Apparently, Flynn reached this conclusion even though the e-mails Spear forwarded to him came from Plaintiffs' Pant Healthcare domain and made no reference to Vanderbeek or Pollard.  Doc. 36 at 4-24.

In any event, based on Flynn's report and the ensuing investigation, UAB concluded that Plaintiffs' work for Pant Healthcare created a conflict of interest. Plaintiffs disagree since Pant Healthcare focused chiefly on surgery scheduling codes, doc. 26 at 13, Rabin Depo. at 25-27; doc. 26-1 at 3, Pravin Depo. at 10-11, 38, a task which Plaintiffs "were not engaged in developing . . . for UAB," doc. 37 at 1 ¶ 13.  Indeed, Kelly admitted that Plaintiffs likely did not intend their St. John's scheduling codes for the use or benefit of UAB because these codes would "never have any usefulness for UAB" since UAB did not provide that particular service.  Doc. 26-1at 43, Kelly Depo. at 59-63.   Nonetheless, UAB concluded that a conflict of interest existed, doc. 37 at 1 at ¶ 13, and that Plaintiffs' consulting work was "close to the day-to-day work" they performed for UAB because it was Cerner based and difficult to distinguish,[4] doc. 26-1 at 74, Hicks Depo. at 17.

---

[4]Cerner is a software company with multiple applications, and even UAB HSIS employees working with Cerner perform varied duties.  Doc. 26-1 at 35, Kelly Depo. at 32-33.  For example, Kevin Smith ("Smith"), former HSIS employee, worked on Cerner-based I-Net for UAB, which UAB contends is completely different from Plaintiffs' Cerner-based work.  Id. at 40-41.  Kelly further testified that Kevin Smith's Cerner-based work for his consulting company had no correlation to the Cerner-based work he performed for UAB.  Id. at 43.  In other words, that a UAB

### D.      Investigation of Plaintiffs' use of UAB resources

Kelly and Hicks' investigation of the allegations in Flynn's e-mail revealed that Plaintiffs used UAB resources for their consulting business on multiple occasions.  Doc. 27 at 6 ¶ 14.  Specifically, the investigation uncovered that:  (1) Plaintiffs worked on the surgery scheduling code on-site at UAB and that HPG billed UAB for the work HPG did on this code, doc. 27 at 5 ¶ 13; doc. 26-1 at 42-43, Kelly Depo. at 57-63; (2) Rabin made approximately 75 long-distance phone calls to St. John's on UAB phones, doc. 26-1 at 47, Kelly depo. at 80-81; (3) Plaintiffs communicated by e-mail with another Pant Healthcare client, Virginia Mason Medical Center (VMMC), during UAB work hours, doc. 26 at 22, Rabin Depo. at 61-62; doc. 26 at 55, 66, Rabin Depo. Exs. 3 and 5; doc. 26-1 at 26, Pravin Depo. Ex. 6; (4) Plaintiffs saved an issue log for VMMC on the UAB server, doc. 26-1 at 26, Pravin Depo. Ex. 6; and (5) Plaintiffs saved documentation for Pant Healthcare on UAB computer hard drives, including bank statements, expense reports, invoices, and time sheets, doc. 26-1 at 73, Hicks Depo. at 14-15. In addition, Kelly reported that Plaintiffs never requested or received permission to engage in external consulting.  Doc. 33-6 at 2.

Plaintiffs admit sending e-mails and making phone calls for Pant Healthcare

---

employee also utilizes Cerner in their consulting work does not create a conflict automatically.

while at UAB.[5]  Doc. 26 at 16 and 26, Rabin Depo., at 39, 49-52; doc. 26-1 at 5,

Pravin Depo. at 17.  However, Plaintiffs deny billing their clients while on UAB

time, doc. 26 at 20-21, Rabin Depo. at 56-57; doc. 26-1 at 7, Pravin Depo. at 28-

29, or enlisting HPG to help on the surgery scheduling code and, therefore, deny

causing UAB to pay HPG for work HPG did for St. John's, doc. 30 at 5 ¶ 20; doc.

26 at 21, Rabin Depo. at 57.  Moreover, Plaintiffs deny saving Pant Healthcare

documents on the UAB server, and claim instead they saved their work on their

desktop hard drives.  Doc. 26 at 24, Rabin Depo., at 75-76.  Finally, Plaintiffs

deny using UAB resources more extensively than other employees.  Doc. 26 at 19,

Rabin Depo. at 52.

Although UAB acknowledges that other employees use UAB resources for

personal benefit, UAB claims that this use "either comported with policy or . . .

was *de minimus*."  *See* Doc. 26-1 at 45, Kelly Depo. at 69-70; doc. 33-3 at 4.

According to Kelly, "[w]e've had some - some issues where employees have - I

mean, you can't manage seventy-five employees and not have some issues where

employees have done a few things here or there that they didn't need to be

counseled . . . ."  Doc. 26-1 at 49, Kelly Depo. at 87.  Finally, as it relates to

---

[5]Rabin testified that he would adjust his work hours to get eight hours in to account for personal time.  Doc. 26 at 19, Rabin Depo. at 49.  Hicks conceded that it was possible that Plaintiffs conducted outside work while on UAB time but stayed late to make up that time.  Doc. 26-1 at 74, Hicks Depo. at 20.

Plaintiffs' use of resources, Kelly testified that while she did not know the specific data size Plaintiffs used for personal storage, Plaintiffs did not slow the system or cause "any damage or inconvenience to anyone at UAB." Doc. 26-1 at 44, Kelly Depo., at 66-67.

Plaintiffs admit they did not disclose in writing their outside consulting to their supervisors. Doc. 26 at 14, Rabin Depo. at 30; doc. 26-1 at 4, Pravin Depo. at 13-14. However, Plaintiffs disagree that they failed to obtain permission to engage in outside consulting. Instead, Plaintiffs maintain that Kelly gave them verbal permission some time prior to 2007. Doc. 26 at 15, Rabin Depo., at 33-34; doc. 26-1 at 3, 5, Pravin Depo., at 13-14, 18. According to Pravin, when he discussed the consulting work with Kelly, Kelly told him he and Rabin did not need to do anything else, and never told him that they needed to obtain written permission.[6] Doc. 26-1 at 4, Pravin Depo. at 14. Also, Rabin testified that Turner, the HSIS clinical manager, knew about the consulting work. Doc. 26 at 11, Rabin Depo. at 18.

Moreover, Plaintiffs maintain that external consulting was a routine and common practice. Doc. 30 at 8 ¶ 7; *see* doc. 26-1 at 38, Kelly Depo. at 43-46; doc. 33-7 at 2. While UAB denies this, doc. 37 at 1 ¶ 7, it is undisputed that UAB's

---

[6] Kelly denies that this conversation ever took place, and that if it did, she would not have made the final decision to approve or disapprove Plaintiffs' activities. Doc. 26-1 at 47, Kelly Depo. at 78-79.

Corporate Compliance training addresses external consulting, doc. 33-2 at 2. Furthermore, Plaintiffs testified that some UAB nurses also work for other healthcare organizations, doc. 26 at 14, Rabin Depo. at 32; doc. 26-1 at 12, Pravin Depo., at 46, and that Hicks' daughter, a nurse employed by UAB Health System, also subcontracted with Kevin Smith's consulting company,[7] doc. 26 at 14, Rabin Depo. at 32; doc. 26-1 at 75, Hicks Depo. at 23-25.

### E.    Plaintiffs' discharge

On February 8, 2008, two days after receiving Flynn's e-mail, doc. 26 at 31, UAB summoned Plaintiffs to a meeting with Hicks, Kelly, Plaintiffs' immediate supervisors (McDanal and Webb), a human resources representative, and a police officer, doc. 30 at 9 ¶14; Doc. 26 at 23, Rabin Depo. at 66-68.  The managers questioned Plaintiffs about their use of UAB resources and accused them of violating UAB policy.[8]  Doc. 33-3 at 12.  At the end of the meeting, UAB placed Plaintiffs on administrative leave.  Doc. 33-3 at 1 ¶¶ 3-4; doc. 37 at 2 ¶ 17.  Four days later, on February 12, 2008, UAB discharged Plaintiffs.  Doc. 26 at 24, Rabin Depo. at 74-75.  Plaintiffs were the first employees in Kelly's department discharged during Kelly's tenure at UAB.  Doc. 26-1 at 49, Kelly Depo. at 86.

---

[7]It is not clear from the record whether this occurred during or after Smith's employment at UAB.
[8]Initially, UAB claimed it discharged Plaintiffs for using UAB intellectual property for personal gain, and this was the "most egregious" violation.  Doc. 33-3 at 2 ¶ 5.  However, later, UAB alleged that using outside consultants to conduct personal business was the "most egregious" violation.  Doc. 26-1 at 41, Kelly Depo. at 55.

Kelly testified that she had no knowledge of other employees allegedly abusing UAB resources.  Doc. 26-1 at 49, Kelly Depo. at 88-89, *see also* Kelly Aff. ¶¶ 11-12.

### F.   Purported comparators

UAB Health System, an entity separate from UAB, employed Kevin Smith, a white male, as a Lead Systems Analyst in the HSIS clinical division from August 2006 to May 2007.  Doc. 33-7 at 1-2, Smith Aff. at ¶¶ 3-4.  Like Plaintiffs, Smith also worked on an aspect of Cerner software.  Doc. 33-7 at 2, Smith Aff. at ¶ 4.  However, although they held the same position, their duties varied because of the "dynamic environment" in HSIS.  Doc. 26-1 at 35, Kelly Depo. at 30-31, 34-36, 40-41; *see also supra* at n.4.  Moreover, Smith's supervisor, like Plaintiffs' supervisors, also reported to Turner, who in turn reported to Kelly.  Doc. 26-1 at 32 and 37, Kelly Depo. at 20, 40.  Furthermore, after UAB hired Smith, Smith started Preceptor Consulting Company, a company through which he provided Cerner-based consulting services.[9]  Doc. 33-7 at 2, Smith Aff., at 2 ¶¶ 6-7; doc. 26-1 at 78-82, Hicks Depo. Ex. 8.  Allegedly, Rabin witnessed Smith using UAB

---

[9] Like Plaintiff, Smith apparently did not obtain permission from his supervisors.  However, Hicks and Kelly contend that Smith started his consulting work before joining UAB and, as a result, was not required to obtain written permission. Doc. 26-1 at 39, Kelly Depo. at 46-47, 53; doc. 26-1 at 75, Hicks Depo. at 21.  Moreover, Kelly testified that Smith's business posed no conflict since Smith provided training to disabled Veterans using Cerner software tools. Doc. 26-1, Kelly Depo., at 47.  Smith submitted an affidavit for Plaintiffs in which he denied these contentions and attested that he started his consulting business *after* UAB hired him, that his managers knew about the business and did not require that he obtain written approval, and that he provided the same consulting services as Plaintiffs. Doc. 33-7 at ¶¶ 4- 9.

computers, phone, and fax for his personal business.  Doc. 26 at 20 and 25, Rabin

Depo. at 53, 77.  As a result, Plaintiffs contend they are similarly situated to

Smith.

###### G.    Discrimination Allegations

Plaintiffs raise several allegations of race and national origin discrimination.

First, they challenge their discharge and contend that Defendants treated them less

favorably than Smith and other employees with consulting businesses.  Doc. 30 at

16.  Second, they contend that UAB discriminated against them by denying them a

four-day work week, which Turner purportedly informed them UAB did not allow.

Doc. 30 at 17; doc. 26-1 at 2, Pravin Depo. at 6-7.  However, they contend that

Smith asked for and received a four-day week.  Doc. 33-7 at 2, Smith Aff., at ¶¶

10-11.  Likewise, Bill Braman and Robert Kirby, white males who did not work

under Kelly, allegedly had four-day work weeks.  Doc. 30 at 17; doc. 26 at 25,

Rabin Depo. at 79-80; doc. 26-1 at 37, Kelly Depo., at 38-40.  Finally, Pravin

alleges discrimination in work assignments and contends that Turner assigned

Deanna Moore, a white female who worked in HSIS under Kelly's supervision, to

an aspect of Cerner software that Pravin conveyed to Turner he wanted.  Doc. 26

at 2, Pravin Depo., at 8-9; doc. 26-1 at , Kelly Depo., at 85-86.

# III.  ANALYSIS

The court turns now to the parties' respective contentions.  In Section A, the court addresses the Title VII claims against UAB and finds that genuine issues of material fact exist which preclude summary judgment.  In Section B, the court addresses the Sections 1981 and 1983 claims against Kelly and finds that Kelly is entitled to qualified immunity.

## A.  Title VII Claims Against UAB

Plaintiffs allege that UAB discriminated against them in violation of Title VII by discharging them due to their race and national origin.  Doc. 30 at 6.  Because Plaintiffs' claim is based on circumstantial evidence, the court applies the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),  burden-shifting framework.  "To establish a *prima facie* case for disparate treatment, [the plaintiff] must show that (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated white employees more favorably; and (4) she was qualified to do the job."  *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotation marks and citation omitted).  If the plaintiff satisfies these elements, then the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its action.  *Id.* If the defendant meets its burden, then the burden shifts back to the plaintiff to

prove that the defendant's reasons are pretext for the unlawful discrimination.  *Id.*

"The ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff."  *Springer*

*v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007)

(citations omitted).

For cases involving an alleged violation of work rules, a plaintiff must show

either that she did not violate the work rule, or that the employer failed to

discharge employees outside the protected class who also violated the work rule in

similar fashion.  *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *see also*

*Anderson v. WBMG-42, Parker Commc'ns Inc.*, 253 F.3d 561 (11th Cir. 2001).  If

the plaintiff establishes a *prima facie* case and presents evidence sufficient to

discredit the employer's reasons for the adverse actions, it is then up to the trier of

fact to make a determination of discrimination.  *Combs v. Plantation Patterns*, 106

F.3d 1519, 1535 (11th Cir. 1997).

1.    <u>Plaintiffs established a *prima facie* case</u>.

As it relates to the *prima facie* case, the parties dispute only the third

element, i.e. whether Plaintiffs can establish that UAB treated a similarly situated

non-minority employee more favorably.  UAB contends that Smith, a white male

Plaintiffs claim UAB allowed to use UAB resources to conduct an external

16

consulting business, is not similarly situated because Smith:  (1) worked for UAB

Health System rather than UAB; (2) resigned before Plaintiffs' discharge; (3) did

not engage in "nearly identical" conduct based on UAB's knowledge; and (4) did

not cause UAB to pay outside consultants for work done on his private businesses.

Doc. 37 at 4-6.  Before addressing each of these contentions, as a threshold matter,

the court notes that UAB's primary contention that Plaintiffs cannot establish a

*prima facie* case because Smith is allegedly not similarly situated to Plaintiffs

overlooks that a failure to identify a comparator is not, by itself, a sufficient basis

to grant summary judgment:

> [Plaintiff's] comparators were deemed not "similarly situated," so the
> court found no tenable claims of race discrimination.  If the record
> contained no circumstantial evidence from which a jury could
> otherwise infer that [plaintiff] was fired because of his race, our
> discussion would end here, and we would affirm the district court's
> judgment.
>
> However, establishing the elements of the *McDonnell Douglas*
> framework is not, and never was intended to be, the *sine qua non* for
> a plaintiff to survive a summary judgment motion in an employment
> discrimination case.  Accordingly, the plaintiff's failure to produce a
> comparator does not necessarily doom the plaintiff's case.
>
> Rather, the plaintiff will always survive summary judgment if he
> presents circumstantial evidence that creates a triable issue
> concerning the employer's discriminatory intent.

*Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1327-28 (11th Cir. 2011)

17

(citations omitted).  Here, Plaintiffs survive summary judgment because, as shown below, they presented "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*  Moreover, they also produced sufficient evidence to rebut UAB's contentions that they are not similarly situated to Smith.

(a)    *Smith's employment by UAB Health System*

UAB contends that Smith is not a proper comparator because he worked for UAB Health System rather than UAB.  Doc. 37 at 4.  "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted).  This requirement necessarily "prevents courts from second-guessing employer's reasonable decisions and confusing apples with oranges."  *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).  The law is clear that "[t]he comparators must perform jobs similar to the plaintiff's; thus, the plaintiff must show that, in her job, she shared the same type of tasks as the comparators."  *Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004) (citation and internal quotation marks omitted), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).

This is the precise scenario here.  Smith, like Plaintiffs, held the same job title, Lead System Analyst, and performed similar duties, i.e. he worked on Cerner-based applications and in the same HSIS clinical division.  Doc. 33-7 at 2 ¶ 4; doc. 26-1 at 37, Kelly Depo. at 40-41.  Moreover, although Smith worked for UAB Health System, he "fell within the primary responsibility of [the same] one middle manager and the same supervisory chain of command" as Plaintiffs. *Anderson*, 253 F.3d at 566.  Specifically, while Smith and Plaintiffs did not share the same immediate supervisor, their respective supervisors reported to Turner, clinical division manager, and Kelly, HSIS Director, who, in turn, reported to Hicks.  Doc. 26-1 at 37, Kelly Depo. at 40; Doc. 26-1 at 73, Hicks Depo. at 13.  Furthermore, the overlap amongst employees and responsibilities between UAB and UAB Health System is further signified by the fact that Hicks, a UAB Health System employee, made the decision to discharge Plaintiffs.  Doc. 26-1 at 72-73, Hicks Depo. at 12-13.  In other words, Smith's employment with UAB Health System does not automatically mean he is not a proper comparator.  To the contrary, Plaintiffs have presented enough facts to establish they are similarly situated to Smith and make a *prima facie* case.  *See Anderson*, 253 F.3d at 566.

        (b)    *Smith's prior resignation*

UAB asserts next that Smith is not a proper comparator because he resigned

"prior to the time period when the Pants were discovered to have engaged in much of the activity which led to their terminations," and, as such, his "actions were too remote in time . . . for him to be a proper comparator." Doc. 37 at 5. This argument misses the mark for several reasons. First, the *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 76-77 (1st Cir. 2004), case UAB cites is distinguishable because it is a promotion case in which other factors influenced promotion rates (such as when openings occur and the market environment). In such a context, remoteness may indeed account for the difference in treatment since the gap in time may have altered the factors at play. Likewise, the *Iurono v. DuPont Pharm. Co.*, 129 F. App'x 637 (2d Cir. 2005), case is also not helpful because the comparator's violation "not only involved a different department, different supervisors, and a different procedural violation, it occurred four years prior to [the plaintiff's]." *Id*. at 641 n.6. In contrast, here, Plaintiffs overlapped with Smith, all three worked in the same department with the same supervisory chain of command, and, at all times, were subject to the same guidelines and policy manual. Furthermore, it is a department that allowed employees to engage in consulting work, with implicit permission to do so on-site at UAB, as long as they still gave UAB a full work day or charged their time to vacation, and with full knowledge that employees may utilize UAB resources for their consulting work. Therefore, in light of Smith's

affidavit that he started a consulting business after UAB hired him, that his supervisors knew about it, and did not require him to obtain written permission, doc. 33-7 at 2, the court declines to find as a matter of law that he is not similarly situated to Plaintiffs.

(c)     *Knowledge of similar conduct by Smith*

Next, although UAB admits that employees use UAB resources for their consulting work, doc. 33-3 at 4, UAB contends that Smith is not similarly situated to Plaintiffs because no one ever reported any alleged abuses by Smith, doc. 26-1 at 45, Kelly Depo. at 70, and that it did not know about Smith's alleged abuses, doc. 37 at 5; *see also* doc. 26-1 at 44-45, Kelly Depo. 68-69 (defining substantial use as "[i]f it was brought to our attention and it caused disruption").  On its face, UAB's argument has merit since, to establish discriminatory motive, Plaintiffs must show that their supervisors had knowledge of similar instances of misconduct and consciously overlooked them.  *See Gerwens*, 874 F.2d at 1542.  However, an inference of discrimination is permissible where management knew or *should have known* about the comparator's alleged misconduct.  *Anderson*, 253 F.3d at 566.  As such, Rabin's testimony that he observed Smith using UAB resources for Smith's consulting business, and purportedly to the same extent as Plaintiffs, raises the possibility that UAB should have known about Smith's

21

alleged excessive use of UAB resources.  In that respect, if a jury finds that management observed Smith utilize resources at the same level as Plaintiffs, then it may be irrelevant that no one complained to UAB about Smith, especially in light of Kelly's testimony that management has an obligation to investigate all instances of abuse.  Doc. 26-1 at 45, Kelly Depo. at 71.

Moreover, Kelly admits also that she and others have simply counseled other employees who misused resources.[10]  This concession is significant since UAB's policy on external consulting essentially acknowledges that employees use UAB resources to conduct their external businesses even during UAB work hours, and the policy permits this personal use as long as it does not rise to a *significant* level.  Doc. 33-1.  Therefore, even if Smith is not a proper comparator, the difference in treatment between Plaintiffs and the other employees whom UAB simply counseled is sufficient "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent," *Smith v. Lockheed*, 644 F.3d at 1328, and allows Plaintiffs to go forward with their case.

(d)    *Engagement of HPG*

Finally, UAB claims that Plaintiffs' use of the HPG consultants for their personal business distinguishes Plaintiffs from Smith and other employees.

---

[10]Kelly testified that "[w]e've had some - some issues where employees have - I mean, you can't manage seventy-five people and not have some issues where employees have done a few things here or there that they didn't need to be counseled . . . ."  Doc. 26-1 at 49, Kelly Depo. at 87.

However, whether UAB had a reasonable basis to believe Plaintiffs engaged HPG for their personal business is disputed.  When viewed in a light most favorable to Plaintiffs, the email evidence supports Plaintiffs' contention that they did not engage HPG or cause HPG to bill UAB for work HPG did for Plaintiffs.  Rather, the e-mail chain indicates that St. John's engaged HPG to troubleshoot Plaintiffs' code.  Indeed, Plaintiffs never mentioned UAB in the St. John's/Pant Healthcare email chain, nor does HPG consultant Vanderbeek's name ever appear on the email exchange.  While Vanderbeek allegedly identified Plaintiffs' code as a UAB code and alerted Flynn (who then alerted UAB), doc. 36, Spear Aff., at ¶¶ 9-11, the record before the court does not support UAB's contention that it had a reasonable basis to believe that Plaintiffs, in their UAB capacity, engaged HPG or caused HPG to bill UAB for work HPG did for Plaintiffs' client St. John's.  To the contrary, the emails show clearly an exchange between Pant Healthcare and St. John's and that St. John's enlisted Spear and HPG.  Doc. 36 at 4 - 24.  In short, UAB has failed to present evidence that establishes that it had a credible basis to believe that Plaintiffs misled HPG and led HPG to bill UAB for work HPG did for St. John's.

Looking at the evidence as a whole, Plaintiffs assert that Smith held the same position in the same division and supervisory chain and also ran a private

consulting company that provided similar Cerner software services without UAB's written permission.  Significantly, Smith confirms Plaintiffs' contentions.  Doc. 33-7.  Moreover, the evidence suggests that other employees who committed similar infractions as Plaintiffs received less severe discipline.  These differences in treatment for allegedly similar conduct are sufficient for Plaintiffs to establish a *prima facie* case.  After all, "[d]emonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  *Holifield*, 115 F.3d at 1562 (citations omitted).  In short, based on the evidence, the court finds that Plaintiffs have met their burden of establishing a *prima facie* case of race and national origin discrimination.[11]

> 2.   Plaintiffs present sufficient evidence of pretext to create a genuine dispute of material fact about the proffered reasons for termination

UAB argues in the alternative that even if Plaintiffs can make a *prima facie* case, UAB is still due to prevail because it discharged Plaintiffs for legitimate, non-discriminatory reasons, i.e. (1) conflicts of interest and commitment, (2)

---

[11] Plaintiffs failed to establish that Flynn, Kirby, Braman, and Moore were similarly situated and, thus, they are not appropriate comparators. Flynn, Kirby, and Braman did not work for UAB HSIS, and did not have the same job title, function, or supervisors.  While Moore worked in HSIS under Kelly, there is no evidence that she engaged in external consulting or used UAB resources for personal reasons.  Furthermore, while Plaintiffs allege that UAB treated Smith and other employees more favorably by granting them a four-day work week, the failure to grant Plaintiffs the four-day work week did not alter the terms, conditions, or privileges of Plaintiffs' employment and, therefore, did not constitute an adverse employment action.  *See Stavropolous v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004).  Summary judgment is therefore granted on Plaintiff's race and national origin claims related to these individuals.

unauthorized engagement in a private venture, and (3) abuse or unauthorized use of UAB equipment including saving a program on UAB's server.  Doc. 33-6 at 1. Since UAB articulated plausible reasons for the discharge, the burden shifts to Plaintiffs to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (citations and quotations marks omitted).  To survive summary judgment, Plaintiffs need to point to evidence that creates a genuine issue that UAB's proffered reasons are false or which shows that a discriminatory reason was the more likely motivation.  *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1291 (11th Cir. 2005) (citation omitted).  Significantly, where, as here, an employer has articulated multiple reasons for the challenged action, the plaintiff must "produc[e] evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered  nondiscriminatory reasons for its actions." *Combs,* 106 F.3d at 1543.  As shown below, Plaintiffs have satisfied their burden on each of UAB's proffered reasons.

(a)     *Conflict of Interest*

UAB claims that it discharged Plaintiffs, in part, because Pant Healthcare created a conflict of interest and a commitment issue.  However, Kelly's testimony

that Plaintiffs "were not engaged in developing surgery scheduling programs for UAB," and that UAB had no use for the surgery scheduling codes Plaintiffs developed for St. John's, undermines this contention.  Doc. 37 at 1; doc. 26-1 at 42-43, Kelly Depo. at 59-63.  After all, a business conflict cannot exist when a product poses no competition to UAB.  Likewise, UAB's contention that an automatic conflict existed because Plaintiffs' consulting involved other hospitals is belied by testimony that other UAB hospital employees also engaged in consulting work for other healthcare organizations, doc. 26 at 14, Rabin Depo. at 32; doc. 26-1 at 12, Pravin Depo. at 46; doc. 26-1 at 75-76, Hicks Depo., at 23-25, including Smith whose consulting company also provided Cerner support services,[12] doc. 33-7 at 2 ¶ 7; doc. 26-1 at 82.

Finally, as to UAB's contention that a conflict existed from Plaintiffs performing Pant Healthcare work during their UAB work hours, Plaintiffs admit that they worked on their consulting work while on-site at UAB.  This admission generally will sustain UAB's contention, except that Plaintiffs testified that they did not charge their time for consulting work to UAB and, instead, purportedly

---

[12] Kelly and Hicks both claim that Smith's personal business provided Cerner training to disabled Veterans, but give different reasons why this business posed no conflict of interest.  Kelly claims that training individuals to use Cerner did not conflict with Smith's UAB duties, but a potential conflict would exist if those individuals worked for another university hospital system.  Doc. 26-1 at 39, Kelly Depo. at 47-48.  Hicks claims the distinction is based on the fact that, to her knowledge, "[Smith] did nothing at UAB to support that outside work."  Doc. 26-1 at 75, Hicks Depo. at 21.  Moreover, Hicks and Kelly testified inconsistently regarding whether Cerner-based work is too similar or too different to constitute a conflict of interest.  *See supra* at n 4.

always gave UAB a full work day by adjusting their schedules, as necessary, to

work late.  Doc. 26 at 19, 20-21, Rabin Depo. at 49, 56-57; doc. 26-1 at 7-8,

Pravin Depo., at 28-29.[13]  Whether Plaintiffs can prove this fact is a matter for the

jury to the decide.  Their contention is, however, sufficient, to survive summary

judgment because UAB permits employees to do precisely what Plaintiffs allege.

Doc. 33-1.  In fact, as Hicks testified, it is indeed possible that Plaintiffs worked

late to ensure that they gave UAB a full work day even on days when they did

outside consulting work.  Doc. 26-1 at 74, Hicks Depo. at 20.

       (b)    *Unauthorized private venture*

Next, UAB contends that it discharged Plaintiffs because Plaintiffs failed to

obtain written permission for their consulting business.  It is undisputed that

Plaintiffs did not have written permission.  However, this failure alone is

insufficient to defeat Plaintiffs' claim for several reasons.  First, Plaintiffs point

out that UAB's external consulting policy is "confusing and incoherent," and that

it is not clear whether the employee or employer, or both, are required to provide

---

[13]Pravin testified to the following:

    Q.     So you were billing somebody though for the work that you did for [VMMC]?
    A.     For the work definitely, but not for this kind of work, no.  Not for the work that I did at
            8:44 on the 13 of July, Friday, so – [email and attachment from VMMC to Rabin and
            Pravin]
    Q.     How about for work that's referenced in that email?
    A.     I could have done this in the weekends after I went home.  I could have done a lot of those things,
            and I usually did in the evenings, weekends.

Doc. 26-1 at 8, Pravin Depo. at 29.

something in writing regarding the outside consulting business.  Doc. 30 at 20.

The court agrees with Plaintiffs on this issue and, indeed, the employee handbook

and annual corporate compliance training are at odds on this point.  Doc. 33-1;

doc. 33-2.  Second, even ignoring the policy language, a factual dispute exists

because Plaintiffs allege they received verbal permission from Kelly prior to 2007,

that Kelly never advised them to undertake any additional action, and that Turner,

their manager, knew about their consulting work.  Doc. 26-1 at 11, Rabin Depo. at

18; doc. 26-1 at 5, Pravin Depo. at 18.  Third, the evidence suggests that at least

one other employee outside the protected class, Smith, also engaged in external

consulting without written permission.  Doc. 33-7.  In fact, Hicks testified that she

could not confirm that all employees with outside consulting businesses obtained

written permission.  Doc. 26-1 at 76, Hicks Depo. at 27.  More significantly, Hicks

added that, typically, the failure to obtain written permission is not grounds for

termination.  *Id.*  In light of these varying facts, UAB's decision to discharge

Plaintiffs immediately, especially when the evidence suggests that UAB does not

strictly enforce the requirements regarding written permission, may lead a jury, if

it is so inclined, to find this inconsistent application to constitute circumstantial

evidence of discrimination.  *See Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d

588, 604 (11th Cir. 2010) (acknowledging that evidence that the defendant applied

its rules "unevenly [ ] would constitute circumstantial evidence of intentional discrimination.") (citations omitted); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."); *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination" where "appellees were willing to break, rather than simply bend, the rules for another white employee."); *Gear v. Ala. State Univ.*, 2011 WL 739085, at *9 (M.D. Ala. Feb. 24, 2011) ("In some circumstances, an employer's failure to follow its own policies may be evidence of pretext."). Therefore, Plaintiffs have successfully rebutted this justification for their discharge.

(c)    *Abuse of resources*

UAB's primary argument for the discharge centers on Plaintiffs' alleged abuse of UAB resources.  In support, UAB offers evidence that it paid a third-party consultant for work on a Pant Healthcare code.  However, as stated previously, when viewed in a light most favorable to Plaintiffs, the evidence indicates that:  (1) Plaintiffs did not request HPG's help for their surgery scheduling code, (2) St. John's enlisted HPG instead to troubleshoot the code, (3) HPG, at no direction from Plaintiffs, billed UAB, rather than St. John's, for the

work, and (4) UAB paid HPG for the work erroneously.  Doc. 26 at 21, Rabin

Depo. at 57-58; doc. 36 at 2-3; doc. 26-1 at 42, Kelly Depo., at 59-60.  While

generally an employer can successfully rebut a *prima facie* case of disparate

treatment by showing that it honestly believed the employee committed a policy

violation, *Gerwens*, 874 F.2d at 1540, the employer's belief must, however, be

reasonable.  Here, Plaintiffs cast doubt on the honest belief defense by presenting

evidence that the facts underlying the proffered reason were false *and* that UAB

knew that when it relied on these allegations to discharge them, or that the

proffered reason involves disputed facts "of a kind that it is improbable that the

employer could have been mistaken about it."  *Walker v. Nationsbank of Fla. N.A.*,

53 F.3d 1548, 1564 n.7 (11th Cir. 1995) (citation omitted).  When viewed in the

light most favorable to Plaintiffs, a jury might find that based on the emails UAB

relied on, it is improbable for UAB to conclude that Plaintiffs engaged HPG or

caused HPG to bill UAB for work HPG did at St. John's request.  Moreover, the

use of UAB resources for external consulting work is apparently common and

permitted.  Therefore, whether Plaintiffs abused resources more significantly than

others is a determination best left for a jury, especially in light of the

inconsistencies in the evidence that may allow a reasonable factfinder to find that

this primary reason for the discharge is unworthy of credence.

In the final analysis, summary judgment is inappropriate on the Title VII

claim because Plaintiffs have met their burden of establishing that UAB's

articulated reasons are pretextual by, among other things, showing that UAB

applied its policies inconsistently.  The case law is clear that where there is

evidence of an inconsistent application of a work policy, circumstantial evidence

of discrimination might exist.  *See Wilson*, 610 F.3d at 604; *Hurlbert*, 439 F.3d at

1299; *Morrison*, 763 F.2d at 1374; *Gear*, 2011 WL 739085, at *9.  In that regard,

the court notes that Plaintiffs have shown that although Kelly and Hicks testified

that policy violations – including the external consulting policy ("we don't

immediately terminate for engaging in outside work") – generally result in

progressive discipline, doc. 26-1 at 47, Kelly Depo. at 77; doc. 26-1 at 76, Hicks

Depo., at 27-28, UAB bypassed the preliminary steps and instead discharged

Plaintiffs.  While UAB justifies the discharges by arguing that Plaintiffs' use of

resources was "substantial" – *e.g.,* "all that bandwidth that was being consumed,"

storage of personal files on UAB hard drives, and practices that interfered with job

performance –, UAB, however, could not specify the amount of bandwidth or

storage space Plaintiffs used for their personal files, or provide any evidence that

these activities interfered adversely with Plaintiffs' job performance.  Doc. 26-1 at

44, 45, 46-47, Kelly Depo. at 66-68, 72, 76-77.  Moreover, while UAB claims that

"[a]ny [white] employees of which [D]efendant had knowledge of such [similar personal] usage either comported with policy or their use was *de minimus*," doc. 33-3 at 4 ¶ 18, what constitutes excessive usage is not defined in the policy and is instead a subjective determination.  Furthermore, Plaintiffs disagree that they used resources to a greater extent than other employees and, as such, a factual dispute exists as to what exactly constitutes substantial personal usage.

Ultimately, whether the gravity of Plaintiffs' alleged conduct differed from other employees is a determination more appropriate for a jury since it involves, in part, an evaluation of the evidence and credibility determinations.  Therefore, because Plaintiffs have shown weaknesses, inconsistencies, and contradictions in UAB's proffered reasons, the court concludes that there are genuine issues of material fact which preclude summary judgment.  Accordingly, UAB's motion on the Title VII claim is **DENIED**.

## B.    Sections 1981 and 1983 claims against Melisa Kelly

Although Plaintiffs do not challenge Defendants' contention that Hicks made the decision to discharge them, doc. 27 at 7 ¶24; *see also* doc. 30 at 6, Plaintiffs assert claims against Kelly nonetheless, claiming that Kelly discriminated against them because of their race and national origin.  Plaintiffs' Section 1981 claims against Kelly are merged with their Section 1983 claims.  *See*

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 893-4 (11th Cir. 2000) (applying *Jett* to hold "§ 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981").  "Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."  *Foy v. Holston*, 94 F.3d 1528, 1534-35 (11th Cir. 1996).  Therefore, "[a] defendant is entitled to qualified immunity under the *Foy* rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, *at least in part*, by lawful considerations."  *Stanley v. City of Dalton*, 219 F.3d 1280, 1296 (11th Cir. 2000) (emphasis in original).

In the present case, even viewing the record in the light most favorable to Plaintiffs, the record reflects that Kelly had an objectively reasonable basis to believe that Plaintiffs committed the alleged policy violations.  While the extent to which Plaintiffs used UAB resources is disputed and the evidence suggests that Plaintiffs' private venture did not affect their work performance, nonetheless, one could indeed construe as a policy violation the fact that Plaintiffs ran a private business using UAB resources and during their UAB work hours, doc. 33-1, and

that Plaintiffs abused resources extensively since the investigation revealed that, among other things, Plaintiffs made 75 long distance calls to one of their personal clients, doc. 26-1 at 47, Kelly Depo. at 80-81.  Moreover, although Plaintiffs question Kelly's motives for recommending their discharge, "the presence of a jury issue about a defendant's improper intent does not necessarily preclude qualified immunity."  *Stanley*, 219 F.3d at 1295 (citation omitted).  Therefore, as it relates to the Sections 1981 and 1983 claims, Kelly is entitled to qualified immunity because she acted, at least in part, on legitimate, non-discriminatory reasons, i.e., the investigation's findings, which she believed showed that Plaintiffs abused resources more extensively than others.  While Plaintiffs have presented sufficient evidence to cast doubt on this reason as it relates to UAB, this, however, does not overcome Kelly's contention that she acted at least in part due to lawful considerations.  *See Stanley*, 219 F.3d at 1296.  Consequently, Kelly is entitled to qualified immunity, and the court **GRANTS** summary judgment in her favor.

## IV.  CONCLUSION

For the foregoing reasons, summary judgment is **DENIED** on the Title VII claims and **GRANTED** on the §§ 1981 and 1983 claims.

Done the 30th day of March, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE